EASTERBROOK, Circuit Judge.
 

 We must decide a question no other appellate court has addressed: whether payments to creditors who dealt at arms’ length with a debtor are subject to the year-long preference-recovery period that 11 U.S.C. § 547(b)(4)(B) provides for “inside” creditors, when the payments are “for the benefit of” insiders, § 547(b)(1). The bankruptcy court in this case answered “no”, 58 B.R. 478 (Bankr.N.D.Ill.1986), and the district court “yes”, 86 B.R. 545 (N.D.Ill.1988). We agree with the district court for the most part, although we conclude that payments satisfying pension obligations ordinarily are not for the benefit of inside creditors, and payments of tax obligations never are.
 

 I
 

 In 1980 V.N. Deprizio Construction Co. was awarded contracts to do $13.4 million of work on the extension of Chicago’s subway system to O’Hare Airport. By 1982 the company was in financial trouble. Because Mayor Byrne wanted the line open before the primary election for that office in February 1983, the City made the firm extraordinary loans of $2.5 million; the firm in turn donated $3,000 to the Mayor’s campaign fund. Neither outlay achieved its purpose. The line wasn’t finished on time, and Byrne lost. These and other dealings by Richard N. Deprizio, the firm’s president, including suspicions of affiliation with organized crime, led the United States Attorney to open an investigation. In April 1983 Deprizio Co. filed a petition under the Bankruptcy Code of 1978. Other firms finished the subway, which opened in 1984.
 

 As the investigation continued and Depri-zio’s indictment was imminent, word circulated that he might “sing”. So in January 1986 Deprizio was lured to a vacant parking lot, where an assassin’s gun and the obligations of a lifetime were discharged together. Corporations are not so easily liquidated.
 

 Deprizio Co. had borrowed money from many sources other than the City of Chicago, including Ingersoll Rand Financial Corp., CIT Group/Equipment Financing, Inc., and Melrose Park Bank & Trust. Richard Deprizio co-signed the note to the Bank. Richard and his brothers, Robert and Edward, all insiders of the firm, also guaranteed its debts to other lenders. (“Insider”, a term to which we return, includes officers of the debtor and the officers’ relatives.) As the district court observed “the record is devoid of detail” concerning these guarantees. Details are po
 
 *1188
 
 tentially important, because CIT maintains on appeal that no insider guaranteed any of the firm’s debts to it. The Trustee does not contest this but maintains that inside creditors received a benefit from payments to CIT because insiders had guaranteed debt secured by collateral in which CIT held the senior interest.
 

 Deprizio Co. was party to collective bargaining agreements calling for payments to pension and welfare plans, for the benefit of the firm’s employees. When it fell behind in making the required payments, the firm executed notes in favor of the plans, secured by junior interests in equipment in which Ingersoll and CIT held senior interests. Richard Deprizio co-signed the notes to several plans. The Central States Pension and Welfare Funds received only notes and security interests, from Deprizio Co.; no insider guaranteed these notes.
 

 Then there were tax obligations. Employers must remit to the government taxes withheld from wages. The Trustee believes that Deprizio Co. fell behind in making these payments but made substantial payments of delinquent withholding taxes in the year before bankruptcy. The United States, on the other hand, believes that Deprizio Co. did not remit any overdue taxes during the year before it filed its petition in bankruptcy.
 

 Payments out of the ordinary course in the 90 days before filing a bankruptcy petition may be recovered for the estate under §§ 547 and 550. Creditors then receive shares determined by statutory priorities and contractual entitlements rather than by their ability to sneak in under the wire. Payments to or for the benefit of an insider during a full year, not just 90 days, may be recovered by virtue of § 547(b)(4)(B). The Trustee filed adversary proceedings against the lenders, the pension and welfare funds, and the United States — none of them insiders — seeking to recover payments made more than 90 days but within the year before the filing. The Trustee reasoned that the payments made to these outside creditors were “for the benefit” of inside co-signers and guarantors, because every dollar paid to the outside creditor reduced the insider’s exposure by the same amount.
 

 Without deciding whether any of the payments was preferential within the meaning of § 547 or worked to the benefit of any insider, the bankruptcy judge denied the Trustee’s request. Judge Eisen concluded that any transfer to an outside creditor for the benefit of an insider should be treated as two transfers: one being the money, and the other the benefit. A transfer may be recovered under § 550(a) only to the extent it is avoidable under § 547. The monetary transfer to the outsider is not avoidable, Judge Eisen concluded, when made more than 90 days before the filing. Thus it may not be recovered from the outsider, even though the benefit to the insider may be recovered from the insider.
 

 On an interlocutory appeal to the district court, Judge Plunkett reversed. He concluded that payment is only one transfer, although a transfer may create benefits for many persons. If the insider receives a benefit, then the transfer is avoidable under § 547(b)(4)(B) if made within a year of the bankruptcy and does not qualify for the exclusions in § 547(c). (These include payments in the ordinary course of business, payments for equivalent value received, and so on.) Section 550(a), as Judge Plunk-ett read it, allows the Trustee to recover the transfer from either the recipient or the indirect beneficiary, at the Trustee’s option. The district court remanded the case so that the bankruptcy court could determine whether the payments identified by the Trustee occurred, whether an insider received a benefit from any particular payment, and whether any of them was protected by § 547(c). Judge Plunkett certified the question under 28 U.S.C. § 1292(b), and we granted leave to appeal.
 
 [1]
 

 II
 

 Many bankruptcy and district judges
 
 *1189
 
 have addressed the question we confront,
 
 [2]
 
 as have commentators.
 
 [3]
 
 A majority of judges have concluded that insiders’ guarantees do not expose outside lenders to an extended preference-recovery period, frequently because they believe that recovery would be inequitable when ordinarily outside creditors need restore only preferences received within the 90 days before bankruptcy. The commentators are evenly divided.
 

 A
 

 Six sections of the Bankruptcy Code supply the texts. Section 547(b) says:
 

 Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
 

 (1) to or for the benefit of a creditor;
 

 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 

 (3) made while the debtor was insolvent;
 

 (4) made—
 

 (A) on or within 90 days before the date of the filing of the petition; or
 

 (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
 

 (5)that enables such creditor to receive more than such creditor would receive if—
 

 (A) the case were a case under Chapter 7 of this title;
 

 (B) the transfer had not been made; and
 

 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 

 This is § 547(b) as amended in 1984. The version in force in 1983, when this case began (and thus the one applicable to it), applied the year-long period for insiders only if the insider “had reasonable cause to believe the debtor was insolvent at the time of such transfer”, § 547(b)(4)(B)(ii), a qualification unimportant to this case.
 

 Section 547(b) uses three terms of art: “creditor”, “insider”, and “transfer”, and the definition of “creditor” brings in a fourth: “claim”. Section 101 defines each.
 

 (4) “claim” means—
 

 (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; ...
 

 (9) “creditor” means—
 

 
 *1190
 
 (A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;
 

 (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; ...
 

 (30) “insider” includes—
 

 (B) if the debtor is a corporation—
 

 (i) director of the debtor;
 

 (ii) officer of the debtor;
 

 (iii) person in control of the debtor;
 

 [[Image here]]
 

 (vi) relative of a general partner, director, officer, or person in control of the debtor;
 

 [[Image here]]
 

 (50) “transfer” means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor’s equity of redemption; ...
 

 Finally there is § 550, which specifies who is liable for a transfer avoided under § 547:
 

 (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 547, ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
 

 (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
 

 (2) any immediate or mediate transferee of such initial transferee.
 

 (b) The trustee may not recover under section (a)(2) of this section from—
 

 (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
 

 (2) any immediate or mediate good faith transferee of such transferee.
 

 (c)The trustee is entitled to only a single satisfaction under subsection (a) of this section.
 

 The Trustee’s argument for extended recovery from outside creditors flows directly from these interlocked provisions.
 

 Suppose Firm borrows money from Lender, with payment guaranteed by Firm’s officer (Guarantor). Section 101(30)(B)(ii) renders Guarantor an “insider”. Guarantor is not Firm’s creditor in the colloquial sense, but under § 101(9) of the Code any person with a “claim” against Firm is a “creditor”, and anyone with a contingent right to payment holds a “claim” under § 101(4)(A). A guarantor has a contingent right to payment from the debtor: if Lender collects from Guarantor, Guarantor succeeds to Lender’s entitlements and can collect from Firm. So Guarantor is a “creditor” in Firm’s bankruptcy. A payment (“transfer”) by Firm to Lender is “for the benefit of” Guarantor under § 547(b)(1) because every reduction in the debt to Lender reduces Guarantor’s exposure.
 
 [4]
 
 Because the payment to Lender assists Guarantor, it is avoidable under § 547(b)(4)(B) unless one of the exemptions in § 547(c) applies. Once the transfer is avoided under § 547, the Trustee turns to § 550 for authority to recover. “Section 547(b)(4) distinguishes according to [whether Guarantor is an “insider”], but § 550 does not. It says that if a transfer is recoverable by the trustee, it may be recovered from
 
 either
 
 the ‘initial transferee’ (Lender) or the ‘entity for whose benefit such transfer was made’ (Guarantor).”
 
 Bonded Financial Services, Inc. v. European American Bank,
 
 838 F.2d 890, 894 (7th Cir.1988) (emphasis in original). So Lender may have to repay transfers received during the year before filing, even though Lender, is not an insider.
 

 Judge Plunkett accepted this chain of reasoning. The creditors seek to break it
 
 *1191
 
 at three links. First, they observe that § 550(a) allows the trustee to recover only “to the extent that a transfer is avoided under” § 547. Viewing each payment as two “transfers” — one to Lender, another to Guarantor — they insist that the only transfer avoidable under § 547 is the one to Guarantor. Second, several of the lenders say that the insiders are not “creditors” for particular debts. Third, CIT submits that payment of a non-guaranteed loan backed by a senior security interest does not produce a “benefit” for an inside guarantor of a junior secured creditor. The district court did not consider this third argument, and we do not pursue it (although we discuss it briefly at the- close of this opinion); it should be resolved in the first instance by the bankruptcy court. The other two arguments we address in reverse order.
 

 B.l
 

 The United States, as tax collector, did not receive a guarantee from any insider of Deprizio Co. There is no note; the debt is created by operation of law. The wrinkle is that 26 U.S.C. § 6672(a) potentially requires insiders to pay any tax the firm should have withheld and paid over. It provides:
 

 Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax ... shall ... be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over....
 

 Because an “insider” may be liable under § 6672(a) when the firm does not pay over taxes, every dollar of tax paid reduces the insider’s exposure. Thus the insider receives a benefit from payment. Section 547(b)(1) speaks, however, of payments for the benefit of creditors, not benefits at large. A person is a “creditor” only to the extent he holds a “claim” against the debt- or. So all turns on whether a “person required to collect, truthfully account for, and pay over any tax” — in the shorthand of tax law, a “responsible person” — has a contingent right to recover from the debtor in bankruptcy, the only basis for calling him a “creditor”.
 

 Section 6672(a) does not authorize a responsible person to recover from the firm. Nothing in the text or structure of the statute suggests that the responsible person can seek compensation from anyone else. The law imposes a “penalty”- on the defaulting responsible person. This is personal liability, standing apart from the firm’s tax debt. The government customarily collects the full tax only once, from the employer or the responsible person, see Policy Statement P-5-60, 1 CCH
 
 Internal Revenue Manual
 
 1305-14;
 
 Emshwiller v. United States,
 
 565 F.2d 1042, 1047 (8th Cir.1977), but nothing in the text of § 6672(a) prevents the Commissioner of Internal Revenue from collecting both the taxes withheld by the employer and the penalty from the responsible person. Because the responsible person owes his own debt to the government,
 
 Monday v. United States,
 
 421 F.2d 1210, 1218 (7th Cir.1970), he does not hold a “claim” against the debtor and so is not a creditor.
 
 In re FJS Tool & Mfg. Co.,
 
 88 B.R. 866, 870 (Bankr.N.D.Ill.1988);
 
 Arrigoni v. CIR,
 
 73 T.C. 792, 800-01 (1980).
 

 The Trustee responds with an argument based on common law: the employer is liable for the tax, the responsible person has been vexed only to ensure collection, and so (the Trustee insists) the responsible person may get contribution or indemnity from the employer. That contingent claim would make the responsible person a creditor. Section 6672(a) does not define a tort, however, and federal courts no longer create private rights of action without support in either the statutory text or the legislative history. See
 
 Karahalios v. Federal Employees Union,
 
 — U.S. —, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989). Rights of contribution and indemnity are no different in principle from other implied rights of action, see
 
 Texas Industries, Inc. v. Radcliff Materials, Inc.,
 
 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). The Trustee has not identified anything suggesting that Congress sought to create a private right of action by the responsible person against
 
 *1192
 
 the employer to accompany the express right in favor of the Commissioner against the responsible person.
 

 Analogies to indemnity at common law do not assist the Trustee. “[T]here can be no indemnity in favor of the intentional or reckless tortfeasor”, W. Page Keeton, et al.,
 
 Prosser and Keeton on Torts
 
 343 (5th ed.1984). Section 6672(a) imposes a penalty only when the responsible person has “willfully” failed to collect or pay over the tax. Wilful is a term with many shadings, but its incarnation in § 6672(a) means at least reckless. “[T]he ‘responsible person’ is liable if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily.”
 
 Wright v. United States,
 
 809 F.2d 425, 427 (7th Cir.1987). See also, e.g.,
 
 Sawyer v. United States,
 
 831 F.2d 755 (7th Cir.1987);
 
 Ruth v. United States,
 
 823 F.2d 1091, 1094-95 (7th Cir.1987);
 
 Purdy Co. v. United States,
 
 814 F.2d 1183, 1188-89 (7th Cir.1987). Cf.
 
 United States v. Sotelo,
 
 436 U.S. 268, 274-75, 98 S.Ct. 1795, 1799-1800, 56 L.Ed.2d 275 (1978). Anyone who must pay a penalty under § 6672(a) also has the degree of involvement and the mental state that would prevent indemnity at common law.
 

 An insider potentially subject to a penalty under § 6672(a) therefore does not hold a “claim” against the debtor and is not its creditor.
 
 In re All Star Sports, Inc.,
 
 78 B.R. 281 (Bankr.D.Nev.1987);
 
 In re Windsor Communications Group, Inc.,
 
 45 B.R. 770 (Bankr.E.D.Pa.1985). Payments to the tax collector, although to the benefit of the responsible person, are not to his benefit
 
 as creditor,
 
 and the Trustee may not recover funds from the United States for transfers more than 90 days before the filing.
 

 B.2
 

 Several of Deprizio Co.’s pension and welfare funds accepted notes co-signed by Richard Deprizio. Payments to the funds on these notes directly reduced his liability. These pension and welfare funds therefore must be treated just like the commercial creditors to the extent of these notes. The Central States pension and welfare funds, however, did not obtain Richard Deprizio’s promise, and the other funds may have received payments on account of the firm’s current obligations, which did not reduce the balances on the notes. The Trustee wants to recover payments made to all funds within the year before the filing on the ground that insiders of the firm are secondarily liable. The theory, as with the tax obligations, is that the insiders hold contingent claims against the debtor if they should be called on to satisfy its debts to the pension and welfare funds, making them “creditors”. Once again the potential benefit to the insiders is obvious but their status as “creditors” is not.
 

 Pension funds look to the employer for payment. Section 515 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1145, requires “[ejvery employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement [to] ... make such contributions in accordance with the terms and conditions of such plan or such agreement.” This statute, which we discussed in detail in
 
 Central States Pension Fund v. Gerber Truck Service, Inc.,
 
 870 F.2d 1148 (7th Cir.1989) (en banc), requires strict adherence to the terms of the contribution agreement, unless those terms are inconsistent with law.
 

 ERISA lacks, however, a provision such as § 6672(a) of the Internal Revenue Code. Nothing in ERISA requires insiders of the firm to stand behind its pension commitments. If this is the whole story, then payments to pension and welfare funds do not provide even a “benefit” to an inside creditor: because the plans are unable to recover from the insiders, payments do not reduce the insiders’ exposure. More, the insiders who are not exposed to personal liability have no potential “claim” against the firm and could not be “creditors”.
 

 Things are not so simple, though. Section 3(5) of ERISA, 29 U.S.C. § 1002(5), defines “employer” as “any person acting directly as an employer, or indirectly in the interest of an employer”, and § 3(9), 29
 
 *1193
 
 U.S.C. § 1002(9), adds that a “person” includes “an individual ... [or] corporation”. Perhaps, then, an insider counts as an “employer” under ERISA to the extent he is acting “indirectly in the interest of an employer”, and therefore is responsible for the firm’s pension and welfare obligations. If the insider’s obligation does not depend on wilful misconduct (thus avoiding the argument that defeated the Trustee’s claims concerning tax payments), the insider’s right to recover over against the firm would make the insider a “creditor”.
 

 Section 3(5) was derived from a similar provision in the Fair Labor Standards Act, and courts have allowed employees to collect from corporate investors and officers under the FLSA when they caused the firms to pay less than the minimum wage. See
 
 Riordan v. Kempiners,
 
 831 F.2d 690 (7th Cir.1987);
 
 Donovan v. Agnew,
 
 712 F.2d 1509 (1st Cir.1983). The analogy to the FLSA led Judge Shadur to conclude that a firm’s managers are jointly and severally liable with the firm for pension obligations.
 
 Gambino v. Index Sales Corp.,
 
 673 F.Supp. 1450, 1452-56 (N.D.Ill.1987). Accord,
 
 Elam v. Seng Truck Leasing Co.,
 
 No. 87 C 8132, 1988 WL 139280 (N.D.Ill.Dec. 14, 1988);
 
 West Virginia-Ohio Valley Area IBEW Welfare Fund v. Ball Electric Co.,
 
 685 F.Supp. 953 (S.D.W.Va.1988). On this approach, payment to the funds yields a benefit for an inside creditor.
 
 Gambino
 
 gives a thoughtful and plausible account of managers’ liability under ERISA. At the end of the day, however, we remain unpersuaded, for two reasons.
 

 First, we must take account of § 515. Only an “employer
 
 who is obligated to make contributions
 
 to” a plan under an agreement need do so. Such an employer must make contributions “in accordance with the terms and conditions of such plan or such agreement.” Even if a manager or other officer is an “employer” under § 3(5), the plan or other agreement still governs what each must do, for not all “employers” are “obligated to make contributions” under the “terms and conditions” of a plan or agreement.
 
 Gerber Truck Service
 
 holds that these documents will be strictly enforced. Exactitude works both ways. Just as pension and welfare plans get no less than the agreements provide, so they get no more. The parent corporation of an employer under the act is an “employer” itself — may even have its own pension plan — but the parent would not be liable under § 515 for its subsidiary’s pension debts in the absence of a promise running from the parent. So it is with other investors and managers. Several plans obtained Richard Deprizio’s personal commitment, as co-maker of notes with Deprizio Co. Other plans had only Deprizio Co.’s commitment to pay. Section 515 requires us to honor the difference between these engagements.
 
 Massachusetts Laborers’ Health and Welfare Fund v. Starrett Paving Corp.,
 
 845 F.2d 23 (1st Cir.1988) (Breyer, J.).
 

 Second, the General Counsel of the Pension Benefit Guaranty Corp., which insures multi-employer pension funds and accordingly has a strong interest in seeing that they collect their due, has concluded that ERISA does not address “shareholder or officer liability”. Opinion Letter 82-38 (Dec. 14, 1982), states: “With regard to your question as to individual shareholder responsibility for withdrawal liability, we note that ERISA has no special rules regarding shareholder or officer liability. Accordingly, this issue is usually determined by State law, which generally provides that shareholders are not liable for the debts of a corporation.” Opinion Letter 82-38 does not go into detail, but even so we owe it some respect.
 
 Gerber Truck Service,
 
 870 F.2d at 1153-54. The approach of this letter has been adopted widely. Courts routinely rebuff efforts to collect pension debts from managers and investors unless the officer or investor would be liable for the firm’s other debts under state law — in other words, unless courts would “pierce the corporate veil” in light of the structure and operation of the particular firm.
 
 Scarbrough v. Perez,
 
 870 F.2d 1079 (6th Cir.1989);
 
 International Brotherhood of Painters v. George A. Kracher, Inc.,
 
 856 F.2d 1546 (D.C.Cir.1988);
 
 Solomon v. Klein,
 
 770 F.2d 352 (3d Cir.1985);
 
 Operating Engineers Pension Trust v.
 
 
 *1194
 

 Reed,
 
 726 F.2d 513 (9th Cir.1984) (Kennedy, J.). It would take a compelling argument to persuade us to depart from an interpretation of the law adopted by a responsible agency and followed by so many courts. Inferences from the importation into ERISA of a few words from the FLSA do not satisfy that standard.
 

 An officer who does not make a contractual commitment to a pension or welfare plan still could be personally liable, to the extent he is liable for general corporate debts under state corporate law,
 
 Starret Paving,
 
 845 F.2d at 26. But when state law recognizes the separate identity of manager and firm, liability under ERISA depends on the contents of the plan and related agreements.
 
 [5]
 
 No insider guaranteed Deprizio Co.’s debts to the Central States pension and welfare funds. Because the Trustee does not maintain that Deprizio Co. is a shell corporation or that the other attributes allowing a court to disregard the corporate form are present, cf.
 
 Secon Service System, Inc. v. St. Joseph Bank & Trust Co.,
 
 855 F.2d 406, 412-16 (7th Cir.1988), payments to the Central States funds did not produce a benefit to an inside “creditor”. Whether particular payments to the other funds produced such an avoidable benefit depends on the terms of their agreements, a topic that must be explored on remand.
 

 Ill
 

 Now for the principal question: whether the Trustee may recover from an outside creditor under § 550(a)(1) a transfer more than 90 days before the filing that is avoided under § 547(b) because of a benefit for an inside creditor. The textual argument, which we have already given, is simple. Section 547(b) defines which transfers are “avoidable”. No one doubts that a transfer to Lender produces a “benefit” for Guarantor. After § 547 defines which transfers may be avoided, § 550(a) identifies who is responsible for payment: “the initial transferee of such transfer
 
 or
 
 the entity for whose benefit such transfer was made” (emphasis added). This gives the trustee the option to collect from Lender, Guarantor, or both, subject only to the proviso in § 550(c) that there can be but one satisfaction.
 

 More than language lies behind this approach. The trustee’s power to avoid preferences (the “avoiding power”) is essential to make the bankruptcy case a
 
 collective
 
 proceeding for the determination and payment of debts. Any individual creditor has a strong incentive to make off with the assets of a troubled firm, saving itself at potential damage to the value of the enterprise. Many a firm is worth more together than in pieces, and a spate of asset-grabbing by creditors could dissipate whatever firm-specific value the assets have. Like fishers in a common pool, creditors logically disregard the fact that their self-protection may diminish aggregate value — for if Creditor A does not lay claim to the assets, Creditor B will, and A will suffer for inaction. All creditors gain from a rule of law that induces each to hold back. The trustee’s avoiding powers serve this end in two ways: first, they eliminate the benefit of attaching assets out of the ordinary course in the last 90 days before the filing, so that the rush to dismember a firm is not profitable from a creditor’s perspective; second, the avoiding powers assure each creditor that if it refrains from acting, the pickings of anyone less civil will be fetched back into the pool. See Thomas H. Jackson,
 
 Avoiding Powers in Bankruptcy,
 
 36 Stan. L.Rev. 725, 727-31, 756-68 (1984).
 

 How long should this preference-recovery period be? If one outside creditor knows that the firm is in trouble, others will too. Each major lender monitors both the firm and fellow lenders. If it perceives that some other lender is being paid preferentially, a major lender can propel Firm into bankruptcy. Reasonably alert lenders
 
 *1195
 
 can act with sufficient dispatch to ensure that the perceived preference is recoverable even when the preference period is short. Section 547(b) makes 90 days the rule, time enough (Congress concluded) for careful creditors to protect themselves (and when one does, small unsecured trade creditors get the benefits too).
 

 Insiders pose special problems. Insiders will be the first to recognize that the firm is in a downward spiral. If insiders and outsiders had the same preference-recovery period, insiders who lent money to the firm could use their knowledge to advantage by paying their own loans preferentially, then putting off filing the petition in bankruptcy until the preference period had passed. Outside creditors, aware of this risk, would monitor more closely, or grab assets themselves (fearing that the reciprocity that is important to the pooling scheme has been destroyed), or precipitate bankruptcy at the smallest sign of trouble, hoping to “catch” inside preferences before it is too late. All of these devices could be costly. An alternative device is to make the preference-recovery period for insiders longer than that for outsiders. With a long period for insiders, even the prescient managers who first see the end coming are unlikely to be able to prefer themselves in distribution.
 

 Loans from insiders to their firms are not the only, or even the most important, concern of outside creditors. Insiders frequently guarantee other loans. If the firm folds while these loans are outstanding, the insiders are personally liable. So insiders bent on serving their own interests (few managers hold outside lenders’ interests of equal weight with their own!) could do so by inducing the firm to pay the guaranteed loans preferentially. If the preference-recovery period for such payments were identical to the one for outside debts, this would be an attractive device for insiders. While concealing the firm’s true financial state, they would pay off (at least pay down) the debts they had guaranteed, while neglecting others. To the extent they could use private information to do this more than 90 days ahead of the filing in bankruptcy, they would make out like bandits. The guaranteed loans would be extinguished, and with them the guarantees. True, it is logically possible to recover from the insider the value of the released guarantee, even if the trustee could not reach the proceeds in the hands of the outside lender. But it is hard to determine the value of a released guarantee, and anyway insiders might think that they would be more successful resisting the claims of the trustee than the hounds of the outside creditors. So an extended recovery period for payments to outside creditors that benefit insiders could contribute to the ability of the bankruptcy process to deter last-minute grabs of assets. The outsiders who must kick into the pool when the trustee uses the avoiding powers retain their contractual entitlements; all the trustee’s recovery does is ensure that those entitlements (as modified by any statutory priorities) — rather than the efforts of insiders to protect their own interests, or the cleverness of outsiders in beating the 90-day deadline — determine the ultimate distribution of the debtor’s net assets.
 

 A
 

 The bankruptcy court bridled at the extended preference period for outside creditors. Treating each payment as two transfers, one to Lender and the other to Guarantor, Judge Eisen concluded that § 550(a) limits the trustee to recovery from Guarantor. Section 550(a) allows recovery only “to the extent that a transfer is avoided” under § 547, and the two-transfer approach implies that the transfer to Lender has not been “avoided” at all. Judge Plunkett disagreed with this approach; so do we.
 

 The two-transfer approach equates “transfer” with “benefit received”. Both Lender and Guarantor gain from payment, and each receives a “transfer” to the extent of the gain. The Code, however, equates “transfer” with payments made. Section 101(50), which we quoted above, says that a transfer is a disposition of property. Sections 547 and 550 both speak of a transfer being avoided; avoidability is an attribute of the transfer rather than of the creditor. While the lenders want to define transfer from the recipients’ per
 
 *1196
 
 spectives, the Code consistently defines it from the debtor’s. A single payment therefore is one “transfer”, no matter how many persons gain thereby.
 
 [6]
 

 Section 550(a) allows recovery “to the extent that a transfer is avoided” not because a single payment may be many “transfers” but because on occasion less than all of a given transfer is “avoided”. Section 547(b)(5) provides that a transfer is avoidable only to the extent it gives the creditor more than it would have received in a liquidation under Chapter 7. Several portions of § 547(c) also contemplate avoiding part of a transfer. Section 547(c)(1), for example, excludes from recovery the portion of a transfer supported by contemporaneous new value. So if Lender receives an asset worth $100 and infuses $80 of new capital, only $20 of the transfer is avoidable. The “to the extent that a transfer is avoided” language in § 550(a) ensures that the trustee recovers only the $20 and not the $100 in such a case.
 
 [7]
 

 There is no greater support for the two-transfer approach in the legislative history than in the text and structure of the Code. The features of the Code important to us were substantially revised by the Conference Committee, which did not issue a report. Managers of the legislation read into the Congressional Record identical statements explaining the Conference Committee’s work, but these statements do not address the subject at hand.
 

 The parties agree that there is no helpful legislative history. They draw different inferences from this, however. The creditors say that we must infer that Congress meant to preserve the practice, under the Bankruptcy Act of 1898, of recovering payments only from those to whom the transfer represented a preference, see
 
 Dean v.
 
 Davis, 242 U.S. 438, 443, 37 S.Ct. 130, 131, 61 L.Ed. 419 (1917) (dictum), on the theory that if Congress made a change as momentous as this, surely someone would have said so. Frequently the pre-1978 practice will be informative.
 
 United Savings Ass’n v. Timbers of Inwood Forest Associates, Ltd.,
 
 484 U.S. 365, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988);
 
 Kelly v. Robinson,
 
 479 U.S. 36, 44-47, 107 S.Ct. 353, 358-60, 93 L.Ed.2d 216 (1986);
 
 Midlantic National Bank v. New Jersey Department of Environmental Protection,
 
 474 U.S. 494, 501, 106 S.Ct. 755, 759-60, 88 L.Ed.2d 859 (1986). Yet “[i]t is not the law that a statute can have no effects which are not explicitly mentioned in its legislative history”.
 
 Pittston Coal Group v. Sebben,
 
 — U.S. —, 109 S.Ct. 414, 420-21, 102 L.Ed. 2d 408 (1988). See also, e.g.,
 
 United States Railroad Retirement Board v. Fritz,
 
 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980);
 
 Harrison v. PPG Industries, Inc.,
 
 446 U.S. 578, 591-92, 100 S.Ct. 1889, 1897, 64 L.Ed.2d 525 (1980);
 
 Swain v. Pressley,
 
 430 U.S. 372, 378-79, 97 S.Ct. 1224, 1228-29, 51 L.Ed.2d 411 (1977). When Congress makes wholesale changes in the text and structure of the law, it is fatuous to pretend that a silent legislative history means that existing practices should continue unchanged. The 1978 Code separates the identification of avoidable transfers (§ 547) from the identification of those who must pay (§ 550), a structural change with no antecedents in the 1898 Act.
 
 [8]
 
 It also creates for the first time the principle that transfers may be recoverable from either transferee or beneficiary — something intro
 
 *1197
 
 duced to § 550(a)(1) in the Conference Committee, too late for comment in the usual committee reports.
 
 [9]
 
 Changes of this character show that the pre-1978 practice is not a useful guide to interpreting the relation between §§ 547 and 550. See
 
 United States v. Ron Pair Enterprises, Inc.,
 
 — U.S. —, 109 S.Ct. 1026, 1031-33, 103 L.Ed.2d 290 (1989).
 

 Applying the longer preference-recovery period to outside creditors would not put the Code in conflict with fundamental policies reflected in both state and federal law —in
 
 Kelly
 
 the policy denying discharge to criminals seeking to avoid penalties for their crimes, in
 
 Midlantic
 
 the policy of requiring those who discharge hazardous wastes to clean them up. The Court thought it fantastic to suppose that Congress would provide for the discharge of criminal restitution orders when it expressly forbade discharge of penal sanctions, or that Congress would allow polluters to leave the mess to someone else (technically, allow unsecured creditors to obtain larger shares of the debtor’s assets even though the clean-up obligation passed through bankruptcy as a charge against the firm’s assets). It therefore resolved ambiguities in the Code in a way harmonious with the structure of the rest of bankruptcy law and non-bankruptcy entitlements. See
 
 Butner v. United States,
 
 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). There is no similarly enduring policy concerning the length of the preference-recovery period for outside creditors or the relation between insiders’ guarantees and the preference-recovery period. An extended recovery period is consistent with the structure of the Code and does not subvert any of its functions. A longer period when insiders reap benefits by preferring one outside creditor over another facilitates the operation of bankruptcy as a collective process and ensures that each creditor will receive payment according to the Code’s priorities and non-bankruptcy entitlements. Silence in the legislative history therefore does not require or authorize a court to depart from the text and structure of the Code.
 
 Chan v. Korean Air Lines, Ltd.,
 
 — U.S. —, —, 109 S.Ct. 1676, 1683-85, 104 L.Ed.2d 113 (1989);
 
 Ron Pair,
 
 109 S.Ct. at 1030.
 

 B
 

 The creditors do not argue that even if the Code extends the preference period, the extension should not be enforced because “inequitable”. Perhaps our rebuff to “equity” arguments in other bankruptcy cases is responsible. See
 
 Bonded Financial,
 
 838 F.2d at 894-95, and, e.g.,
 
 In re Iowa R.R.,
 
 840 F.2d 535, 536 (7th Cir.1988);
 
 In re Chicago, Milwaukee, St. Paul & Pacific R.R.,
 
 791 F.2d 524, 528 (7th Cir.1986);
 
 Boston & Maine Corp. v. Chicago Pacific Corp.,
 
 785 F.2d 562, 566 (7th Cir.1986). See also, e.g.,
 
 Norwest Bank Worthington v. Ahlers,
 
 485 U.S. 197, 108 S.Ct. 963, 968-69, 99 L.Ed.2d 169 (1988) (“whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code”);
 
 Official Committee v. Mabey,
 
 832 F.2d 299, 301-02 (4th Cir.1987);
 
 Guerin v. Weil, Gotshal & Manges,
 
 205 F.2d 302, 304 (2d Cir.1953) (A. Hand, J.). “There is a basic difference between filling a gap left by Congress’ silence and rewriting rules that Congress has affirmatively and specifically enacted.”
 
 Mobil Oil Corp. v.
 
 
 *1198
 

 Higginbotham,
 
 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978). Bankruptcy laws are not special cases, as
 
 Ahlers
 
 demonstrates.
 
 [10]
 
 See also
 
 SEC v. United States Realty & Improvement Co.,
 
 310 U.S. 434, 455-57, 60 S.Ct. 1044, 1053-54, 84 L.Ed. 1293 (1940).
 

 Nonetheless, “equity” arguments have captivated a majority of the bankruptcy judges and several of the commentators who have spoken on this subject (see notes 2 and 3 above). So it is worth pointing out that even if equity arguments were admissible, they would not help the creditors’ cause. Rules of law affecting parties to voluntary arrangements do not operate “inequitably” in the business world — at least not once the rule is understood. Prices adjust. If the extended preference period facilitates the operation of bankruptcy as a collective debt-adjustment process, then credit will become available on slightly better terms. If a longer period has the opposite effect, creditors will charge slightly higher rates of interest and monitor debtors more closely. In either case creditors will receive the competitive rate of return in financial markets — the same risk-adjusted rate they would have received with a 90-day preference-recovery period. A rule may injure debtors and creditors by foreclosing efficient business arrangements and increasing the rate of interest low-risk borrowers must pay, see
 
 In re Thompson,
 
 867 F.2d 416, 419 (7th Cir.1989);
 
 In re Patterson,
 
 825 F.2d 1140, 1142 (7th Cir.1987);
 
 In re Erickson,
 
 815 F.2d 1090, 1094 (7th Cir.1987), but inefficiency is not inequity. At all events, in what sense is it “inequitable” to recapture payments to creditors that may have been favored only because payment reduced insiders’ exposure (recall that the insiders select which debts to pay first), then distribute these monies according to statutory priorities and contractual entitlements? In what sense is it “inequitable” to require the outside lenders to pursue the inside guarantors for any shortfall, when they bargained for exactly that recourse? See also 86 B.R. at 552-53.
 

 Our creditors press a cousin to “equity” arguments: “policy” arguments. According to the creditors, an extended preference period will force lenders to precipitate bankruptcy filings at the slightest sign of trouble in order to prevent erosion of their positions. The lenders paint a bleak picture of firms driven under when the problems could have been worked out — if only the lenders knew that they would keep what they receive in the “workout”. Workouts often involve guarantees, and if these mean longer preference periods, then workouts may become less common (and formal bankruptcy more common). It is not clear to us that bankruptcy proceedings are more costly than workouts. See
 
 Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,
 
 786 F.2d 794, 802-03 (7th Cir.1986) (concurring opinion). It’s not as though the filing of a bankruptcy petition closes the firm and heaves its workers into the streets. A firm with positive cash flows will continue operating in bankruptcy; the court simply sorts out the financial claims to the enterprise. Creditors are free to compromise their claims inside of bankruptcy, just as they are outside it.
 
 [11]
 
 So the fear of bankruptcy replacing some workouts does not lead us to shy away from an ordinary reading of the statute.
 

 For what it may be worth, we doubt that an extended preference-recovery period will cause a stampede from workouts to bankruptcies. Unless there is a “preference”, there is nothing for the trustee to avoid. Most of the tales of woe presented by the
 
 *1199
 
 creditors do not involve preferences in light of § 547(b)(5), which says that a transfer is a preference only to the extent the creditor got more than it would have received in a liquidation, and § 547(c), which specifies situations that do not create avoidable preferences.
 

 § 547(c) The trustee may not avoid under this section a transfer—
 

 (1) to the extent that such transfer was—
 

 (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
 

 (B) in fact a substantially contemporaneous exchange;
 

 (2) to the extent that such transfer was—
 

 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
 

 (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 

 (C) made according to ordinary business terms;
 

 (3) that creates a security interest in property acquired by the debtor—
 

 (A) to the extent such security interest secures new value [in the nature of a purchase-money security interest]
 

 (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
 

 (A) not secured by an otherwise unavoidable security interest; and
 

 (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;
 

 (5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction ... to the prejudice of other creditors holding unsecured claim.;, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt on [one of three defined dates]
 

 (6) that is the fixing of a statutory lien that is not avoidable under section 545 of this title; or
 

 (7) [aggregate transfers of less than $600 for an individual debtor].
 

 This is the current version of § 547(c), as amended in 1984 to eliminate the former requirement in § 547(c)(2) that the payment come within 45 days of the debt to count as one in due course, a qualifier that at least potentially allowed the trustee to recover all installment payments, because the contract had been signed and credit extended more than 45 days before a given payment. Cf.
 
 In re Xonics Imaging Inc.,
 
 837 F.2d 763 (7th Cir.1988). We need not decide whether installment payments before 1984 may be recovered even though made within 45 days of their due date, because this appeal does not present for decision the Trustee’s effort to recoup any particular transfer. It is enough to observe that § 547(b)(5) and (c), both before and after amendment, exclude from recovery the bulk of ordinary commercial payments.
 

 Consider some of the transactions the lenders use to illustrate what they view as pernicious consequences of an extended preference-recovery period:
 

 • A fully-secured creditor with an insider’s guarantee to boot is paid off nine months before bankruptcy and releases its security interest. The debtor uses the property as security for a new loan. The trustee recovers the payment as a preference, and the creditor has been stripped of its security.
 

 The trustee confronts two obstacles in such a case. First, if the creditor was fully secured, then payment does not produce a benefit for the inside guarantor, whose exposure was zero. The preference-recovery period therefore would be only 90 days. Second, under § 547(b)(5) a transfer is avoidable only to the extent the creditor received more than it would have in a Chapter 7
 
 *1200
 
 liquidation. A fully-secured creditor will be paid in full under Chapter 7, so there is no avoidable preference in this case with or without a guarantee by an insider. If, on the other hand, the security covered only 90% of the debt, then only the remaining 10% of the payment is avoidable as a preference.
 

 • A creditor financing the debtor’s inventory and receivables makes many loans and receives many payments during the year before the filing. The trustee seeks to recover all of these. Under § 547(c)(5), however, the trustee must show that the lender improved its position relative to other creditors during the preference period. See
 
 In re Ebbler Furniture & Appliances, Inc.,
 
 804 F.2d 87 (7th Cir.1986). Ordinary financing arrangements do not produce such an effect.
 

 • A creditor makes an unsecured loan guaranteed by an insider and requires monthly payments over a number of years. The trustee seeks to recover all of the payments during the year before the filing. To the extent the debt- or paid on time, the creditor is protected by the current version of § 547(c)(2), the “ordinary course” rule. (The state of things for payments before the amendment is less clear, as we have mentioned.)
 

 • Lender # 1 extends credit and takes security. It is so over-secured that Lender # 2 is willing to make a second loan and take a junior security interest. This second loan (but not the first) is backed up by an insider’s guarantee. Every payment to Lender # 1 increases the amount of security available for Lender # 2, which produces a benefit to Guarantor by reducing his exposure. Cf.
 
 In re Prescott,
 
 805 F.2d 719, 731 (7th Cir.1986). The trustee seeks to recover all payments to Lender # 1 during the year before the filing, even though Lender # 1 did not negotiate for an insider’s guarantee. This appears to be the Trustee’s position vis-á-vis CIT. If the payments had been made after the 1984 amendments, then § 547(c)(2) would prevent recovery. Even under the pre-1984 law that applies to this case, we have substantial doubt that the payments to Lender # 1 are avoidable transfers. By assumption Lender # 1 is over-secured, so its position has not been improved relative to a Chapter 7 liquidation, § 547(b)(5). The benefit in such a case is negligible at best, so the case for recapture is weak.
 
 Bonded Financial,
 
 838 F.2d at 895. Because neither the bankruptcy court nor the district court considered this question in detail, we do not resolve it, but the Trustee has an uphill battle.
 

 In light of these exclusions, there is no reason to use ambulatory arguments of “equity” or “policy” to defeat the Trustee’s claims in this case. Congress has considered and addressed specifically the situations that most concern lenders. If these exclusions and exemptions are not “enough”, creditors should complain to Congress.
 

 IV
 

 To sum up: We hold in Part II.B.l that insiders who may be liable on account of the firm’s failure to pay taxes are not “creditors” because they do not hold “claims” against their firms. Accordingly, delinquent taxes paid more than 90 days before the filing may not be recovered under § 550(a). We conclude in Part II.B.2 that pension and welfare trusts may recover from insiders only to the extent state law allows that under rules for disregarding the corporate form, or the insiders make contractual commitments enforceable under § 515 of ERISA. When state law supports “veil piercing” it does so on the ground that the investor and the firm are a single entity, which precludes the insider from holding a “claim” against the firm. The Trustee therefore may not recover payments to pension and welfare trusts made more than 90 days before the filing, unless those trusts negotiated for and received contractual guarantees from insiders — in which event the funds should be treated just like any other outside creditor. We hold in Part III that the preference-re
 
 *1201
 
 covery period for outside creditors is one year when the payment produces a benefit for an inside creditor, including a guarantor.
 

 The judgments of the district court are affirmed in part and reversed in part. The cases are remanded for further proceedings consistent with this opinion.
 

 [1]
 

 . One creditor’s appeal from the bankruptcy court was assigned to Judge Leinenweber, who held the case in abeyance pending Judge Plunk-ett’s opinion and followed his decision in a brief order. This court consolidated the appeals.
 

 [2]
 

 . Five cases answer "yes”: the district court’s decision here plus
 
 In re Robinson Bros. Drilling, Inc., 97
 
 B.R. 77 (W.D.Okla.1988), appeal pending, No. 88-8089 (10th Cir.);
 
 In re Coastal Petroleum Corp.,
 
 91 B.R. 35 (Bankr.N.D.Ohio 1988);
 
 In re W.E. Tucker Oil, Inc.,
 
 42 B.R. 897 (Bankr.W.D.Ark.1984);
 
 In re Big Three Transportation, Inc.,
 
 41 B.R. 16 (Bankr.W.D.Ark.1983). These cases answer "no” on the ground that extended preference recovery would be inequitable:
 
 In re T.B. Westex Poods, Inc., 96
 
 B.R. 77 (Bankr.W.D.Tex.1989) (alternative holding);
 
 In re Midwestern Companies Inc.,
 
 96 B.R. 224 (Bankr.W.D.Mo.1988);
 
 In re C-L Cartage Co.,
 
 70 B.R. 928 (Bankr.E.D.Tenn.1987);
 
 In re Aereo Metals, Inc.,
 
 60 B.R. 77 (Bankr.N.D.Tex.1985);
 
 In re R.A. Beck Builder, Inc.,
 
 34 B.R. 888 (Bankr.W.D.Pa.1983);
 
 In re Duccilli Formal Wear, Inc.,
 
 8 Bankr.Ct. Dec. (CRR) 1180 (Bankr.S.D.Ohio 1982);
 
 In re Cove Patio Corp.,
 
 19 B.R. 843 (Bankr.S.D.Fla.1982);
 
 In re Church Buildings & Interiors, Inc.,
 
 14 B.R. 128 (Bankr.W.D.Okla.1981). Two answer "no" on the ground that insider and outsider receive different “transfers", only one of which may be recovered: the bankruptcy judge’s opinion in our case and
 
 In re Mercon Industries, Inc.,
 
 37 B.R. 549 (Bankr.E.D.Pa.1984).
 
 (Midwestern
 
 adopts this view as an alternative holding.)
 

 [3]
 

 . Compare Lawrence P. King, 4
 
 Collier on Bankruptcy
 
 ¶ 550.02 at 550-8 (15th ed. 1987), and Vern Countryman,
 
 The Trustee’s Recovery in Preference Actions,
 
 3 Bankruptcy Developments J. 449, 464 (1986), both saying "no" on grounds of equity, with Isaac Nutovic,
 
 The Bankruptcy Preference Laws: Interpreting Code Sections 547(c)(2), 550(a)(1), and 546(a)(1),
 
 41 Bus.Law. 175, 186-99 (1985), and Thomas E. Pitts, Jr.,
 
 Insider Guaranties and the Law of Preferences,
 
 55 Am.Bankr.L.J. 343 (1981), both answering “yes”. See also Phillip I. Blumberg,
 
 The Law of Corporate Groups: Bankruptcy Law
 
 § 9.03 (1985 & Supp.1988), contending that the answer should depend on whether the insider is solvent. A student note suggests still another approach. Note,
 
 The Interplay Between Sections 547(b) and 550(a)(1) of the Bankruptcy Code,
 
 89 Colum. L.Rev. 530 (1989).
 

 [4]
 

 . This is even clearer when the insider is a co-maker on the note, as Richard Deprizio was on several. On the other hand, a co-maker may have no right to recover from the firm and therefore no “claim” in bankruptcy. The parties have not treated inside co-makers differently from inside guarantors, so neither shall we.
 

 [5]
 

 . Section 502(a)(3)(B)(ii), 29 U.S.C. § 1132(a)(3)(B)(ii), adds nothing to § 515. It authorizes a plan’s trustee to bring suit to "enforce any provisions of this subchapter or the terms of the plan." This returns us to the question whether the "terms of [a] plan” require managers and investors to stand behind the employer's pension commitments, the same question to which § 515 directs us.
 

 [6]
 

 .The creditors contend that
 
 In re Air Conditioning, Inc.,
 
 845 F.2d 293, 296-97 (11th Cir.1988), and
 
 In re Compton Corp.,
 
 831 F.2d 586, 591-94 (5th Cir.1987), modified on other grounds, 835 F.2d 584 (1988), take a different view. These two cases do not consider the relation between §§ 547 and 550 of the Code or mention § 101(50). Identifying multiple "transfers” was an heuristic device to explain how recoveries could be had from indirect beneficiaries under the 1898 Act, which on the surface did not allow such recoveries. See note 9 below. In summarizing this approach, the Fifth and Eleventh Circuits did not thereby resolve a question that was not before them. (The
 
 holding
 
 of each case was that a recoverable preference had taken place.)
 

 [7]
 

 . The legislative history supports this understanding. See, e.g., H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 375-76 (1977); S.Rep. No. 95-989, 95th Cong., 2d Sess. 90 (1978), U.S.Code Cong.
 
 &
 
 Admin.News 1978, pp. 5787, 5876, 5963, 6331, 6332.
 

 [8]
 

 . This separation was well thought out and discussed at length in the legislative history, although without discussing all of its consequences. See the references in note 7 above.
 

 [9]
 

 . And obviously too late for comment in the Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 137, 93d Cong., 1st Sess. (1973). This Report has influenced the interpretation of the many features of the 1978 Code it proposed and discussed in detail. As the creditors observe, the Report does not mention the possibility that outside lenders could be subject to an extended preference-recovery period on account of insiders’ guarantees. The Report discussed (and discarded) a proposal to make transfers avoidable on account of benefits to insiders, reasoning that this was implicit under current law. Re
 
 port
 
 pt. II at 170; see
 
 National Bank of Newport v. National Herkimer County Bank,
 
 225 U.S. 178, 184, 32 S.Ct. 633, 635, 56 L.Ed. 1042 (1912). The creditors ask us to infer that the “benefit” language in the Code did not change the law. But it is not the "benefit” language of § 547(b)(1), the possibility discussed by the
 
 .Re
 
 port, that makes the change; it is the novel text of § 550(a)(1), allowing recovery from either transferee or beneficiary, that underlies the Trustee’s claim. Because that change did not happen until five years after the
 
 Report,
 
 its silence on the subject is not informative.
 

 [10]
 

 . Whatever force the assertion in
 
 Bank of Marin v. England,
 
 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966), that "equitable principles govern the exercise of bankruptcy jurisdiction" may have had under the 1898 Act, this approach has no place under the Code to the extent the statute addresses the question.
 

 [11]
 

 . To a substantial extent a corporate bankruptcy is nothing but an orderly forum for private adjustments. Often these adjustments could be made at least cost if the firm were sold intact and the proceeds divided according to contractual and statutory entitlements, see Douglas G. Baird,
 
 The Uneasy Case for Corporate Reorganization,
 
 15 J. Legal Studies 127 (1986), but even when the court rather than an auction market resolves questions of valuation, it is serving a function equally important in a private workout.